

IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
November 21, 2016 Session

## IN RE JEREMIAH N., ET AL.[1]

**Appeal from the Chancery Court for Hamblen County**
**No. 2015-CV-259    Douglas T. Jenkins, Chancellor**

_____

**No. E2016-00371-COA-R3-PT**

_____

The maternal grandmother of three children filed a petition to terminate the parental rights of the father of each child on various grounds and to allow the grandmother to adopt the children; the children's mother joined in the petition for the purpose of consenting to the termination of her parental rights and to the adoption.  Two of the fathers were incarcerated at the time of the proceeding and the father of the third child was unknown.  The trial court terminated the rights of the father of one child on the grounds of abandonment by engaging in conduct prior to his incarceration that exhibited a wanton disregard for the welfare of his child and on the ground that the father had been convicted of an offense and was under a sentence of more than ten years; the court terminated the rights of the father of another child on the grounds of abandonment by failure to support and visit his child within the four months preceding his incarceration and by engaging in conduct prior to his incarceration which exhibited a wanton disregard for the welfare of his child.  The fathers of these children appeal.  We reverse the judgment terminating the parental rights of one father on the ground of abandonment by failure to support and the judgment terminating the rights of the other father on the ground of abandonment by engaging in conduct evidencing a wanton disregard for his child; in all other respects, the judgments terminating the parental rights of the fathers are affirmed.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Reversed**
**in Part and Affirmed in Part; Case Remanded**

RICHARD H. DINKINS, J., delivered the opinion of the court, in which D. MICHAEL SWINEY, C.J., and CHARLES D. SUSANO, JR., J., joined.

Crystal Goan Jessee, Greeneville, Tennessee, for the appellant, Warren A.

---

[1]  This Court has a policy of protecting the identity of children in parental termination cases by initializing the last names of the parties.

Lauren Armstrong Carroll, Morristown, Tennessee, for the appellant, Michael P.

Daniel G. Boyd, Rogersville, Tennessee, for the appellee, Pamela N.

## OPINION

### I. FACTUAL AND PROCEDURAL BACKGROUND

This is a proceeding to terminate the parental rights of the fathers of three children, Jeremiah N. (born in 1999), Cidney N. (born in 2002), and Robert N. (born in 2006), and to adopt the children. Amanda N. ("Mother") is the children's mother; Warren A. is the father of Cidney, Michael P. is Robert's father, and Jeremiah's father is not known. Pamela N. ("Grandmother") is the children's maternal grandmother; she received custody of Jeremiah on September 29, 1999, and of Cidney and Robert on August 8, 2007, by orders of the Hamblen County Juvenile Court.

Pamela N. filed the petition on May 21, 2015. Pursuant to Tennessee Code Annotated section 36-1-117, Amanda N. joined in the petition "for the purpose of providing her consent to the adoption to the minor children." The petition alleged that each father abandoned or otherwise willfully failed to maintain contact with his child, willfully failed to make reasonable payments towards the child's support, and engaged in conduct which showed a wanton disregard for the welfare of his child. Warren A. and Michael P. initially filed *pro se* responses to the petition; following the appointment of counsel, answers were filed on their behalf, both denying that grounds existed to terminate their rights. Trial on the petition was held on January 25, 2016.

In an order entered February 18, 2016, the court terminated Michael P.'s rights on the ground of abandonment by failure to support, failure to visit, and by engaging in conduct exhibiting a wanton disregard for the welfare of Robert; terminated Warren A.'s rights only on the ground of abandonment by engaging in conduct exhibiting a wanton disregard for the welfare of Cidney; and terminated the rights of the unknown Father to Jeremiah upon a finding of "sufficient statutory grounds." The court also confirmed Mother's consent to the adoption.

Michael P. and Warren A. appeal.

### II. STANDARD OF REVIEW

Parents have a fundamental right to the care, custody, and control of their children. *Stanley v. Illinois*, 405 U.S. 645, 651 (1972); *In re Adoption of A.M.H.*, 215 S.W.3d 793, 809 (Tenn. 2007). However, that right is not absolute and may be terminated in certain circumstances. *Santosky v. Kramer*, 455 U.S. 745, 753-54 (1982); *State Dep't of Children's Services v. C.H.K.*, 154 S.W.3d 586, 589 (Tenn. Ct. App. 2004). The statutes

2

on termination of parental rights provide the only authority for a court to terminate a parent's rights. *Osborn v. Marr*, 127 S.W.3d 737, 739 (Tenn. 2004). Thus, parental rights may be terminated only where a statutorily defined ground exists. Tenn. Code Ann. § 36-1-113(c)(1); *Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn. 2002); *In re M.W.A.*, 980 S.W.2d 620, 622 (Tenn. Ct. App. 1998). To support the termination of parental rights, only one ground need be proved, so long as it is proved by clear and convincing evidence. *In the Matter of D.L.B.*, 118 S.W.3d 360, 367 (Tenn. 2003).

Because the decision to terminate parental rights affects fundamental constitutional rights and carries grave consequences, courts must apply a higher standard of proof when adjudicating termination cases. *Santosky*, 455 U.S. at 766–69. A court may terminate a person's parental rights only if (1) the existence of at least one statutory ground is proved by clear and convincing evidence and (2) it is shown, also by clear and convincing evidence that termination of the parent's rights is in the best interest of the child. Tenn. Code Ann. § 36-1-113(c); *In re Adoption of A.M.H.*, 215 S.W.3d at 808–09; *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). In light of the heightened standard of proof in these cases, a reviewing court must adapt the customary standard of review set forth by Tenn. R. App. P. 13(d). *In re M.J.B.*, 140 S.W.3d 643, 654 (Tenn. Ct. App. 2004). As to the court's findings of fact, our review is *de novo* with a presumption of correctness unless the evidence preponderates otherwise, in accordance with Tenn. R. App. P. 13(d). *Id.* We must then determine whether the facts, "as found by the trial court or as supported by the preponderance of the evidence, clearly and convincingly establish the elements" necessary to terminate parental rights. *Id.*

## III. DISCUSSION

Michael P. and Warren A. both assert, *inter alia*, that the trial court erred in holding that they abandoned their respective child. Tennessee Code Annotated section 36-1-113(g)(1) provides that abandonment, as defined at section 36-1-102(1)(A), constitutes a ground for termination; subsection (iv) of the latter statute sets out definitions of abandonment that apply when the parent whose rights are sought to be terminated is incarcerated when the proceeding is instituted. Pertinent to this case, the ground applies where the parent is alleged to have failed to visit or support the child in the four months immediately prior to incarceration or to have "engaged in conduct prior to incarceration that exhibits a wanton disregard for the welfare of the child." Tenn. Code Ann. § 36-1-102(1)(A)(iv). As both fathers were incarcerated at the time the petition was filed, we apply the definition at section 36-1-102(1)(A)(iv) in our resolution of the issue of abandonment.[2]

---

[2] Tennessee Code Annotated section 36-1-102(1)(A)(iv) states in pertinent part:

> (1)(A) For purposes of terminating the parental or guardian rights of a parent or parents or a guardian or guardians of a child to that child in order to make that child available for adoption, "abandonment" means that:

## A. MICHAEL P.

Michael P.'s rights were terminated on the grounds of abandonment by failure to support, failure to visit, and by engaging in conduct exhibiting a wanton disregard for the welfare of Robert. He raises the following issues:

1. Whether the Court erred in finding by clear and convincing evidence that [Michael P.] abandoned Robert N. by willfully failing to support or make reasonable payments toward the support of Robert N. for four (4) consecutive months preceding his incarceration, from August 2007 to December 2007.
2. Whether the Court erred in finding by clear and convincing evidence that [Michael P.] abandoned Robert N. by willfully failing to visit or engage in more than token visitation with Robert N. for four (4) consecutive months preceding his incarceration, from August 2007 to December 2007.
3. Whether the Court erred in finding by clear and convincing evidence that Father P. has engaged in a course of conduct which shows a wanton disregard for the welfare of Robert N.
4. Whether the Court erred in finding by clear and convincing evidence that Father P. did not make an adjustment of circumstances or conditions to have a present, meaningful relationship with Robert N., did not maintain regular visitation or contact with Robert N., did not provide support for the benefit of Robert N., and has not maintained a meaningful relationship with Robert N. since his birth, thus concluding that termination of [Michael P.'s] parental rights is in the best interest of Robert N.

### 1. Willful Failure to Support and Failure to Visit

Michael P. does not contend that he paid support. Rather, he argues that the record does not show that he knew he had a duty to support Robert, that he had the ability to provide support, that he made no attempts to provide support, and that he had no

---

* * *

(iv) A parent or guardian is incarcerated at the time of the institution of an action or proceeding to declare a child to be an abandoned child, or the parent or guardian has been incarcerated during all or part of the four (4) months immediately preceding the institution of such action or proceeding, and either has willfully failed to visit or has willfully failed to support or has willfully failed to make reasonable payments toward the support of the child for four (4) consecutive months immediately preceding such parent's or guardian's incarceration, or the parent or guardian has engaged in conduct prior to incarceration that exhibits a wanton disregard for the welfare of the child.

The standard of abandonment that asks whether the parent has engaged in conduct that shows a wanton disregard for the child prior to incarceration is not limited to the four-month period before the parent is incarcerated. *In re Audrey S.*, 182 S.W.3d 838, 865 (Tenn. Ct. App. 2005).

4

justifiable reason for not providing support. With respect to failure to visit, he contends that an order of protection prohibiting him from being around Mother restricted his ability to visit; that, despite the order of protection, he did visit; and that the visitation he engaged in was not token. We construe Michael P.'s contentions as to both grounds as addressing the element of willfulness in his failure to pay support and in the manner in which he exercised visitation.

In *In re Audrey S.*, the court discussed willfulness in the context of termination cases:

> The concept of "willfulness" is at the core of the statutory definition of abandonment. A parent cannot be found to have abandoned a child under Tenn. Code Ann. § 36-1-102(1)(A)(i) unless the parent has either "willfully" failed to visit or "willfully" failed to support the child for a period of four consecutive months. . . .
>
> In the statutes governing the termination of parental rights, "willfulness" does not require the same standard of culpability as is required by the penal code. Nor does it require malevolence or ill will. Willful conduct consists of acts or failures to act that are intentional or voluntary rather than accidental or inadvertent. Conduct is "willful" if it is the product of free will rather than coercion. Thus, a person acts "willfully" if he or she is a free agent, knows what he or she is doing, and intends to do what he or she is doing.

182 S.W.3d at 864-65 (citations omitted). With this definition in mind, we proceed to examine the evidence.

### a. Failure to Support

In addition to the holding in the final order that Michael P. willfully failed to support Robert, the court made the following statement at the hearing:

> With respect to support of the minor child, he had an opportunity August 2007 to December 2007 to support the child, and I do realize that he was living with the child's mother at least on and off part of that time, and maybe even living with the grandmother, who's the custodian of the child, a small portion of that time. But the testimony that I heard from Pamela N[.], which I credit, is that he did not support the child. That she was and has been responsible for that since she received the child into her household, which was very shortly after the child's birth.

5

This court has held that a parent's failure to support is "willful" when the parent (1) knows of his or her duty to support, (2) has the ability to provide support, (3) makes no effort to provide support, and (4) has no justifiable reason for not providing support. *In re Audrey S.*, 182 S.W.3d at 864. A failure to support is not excused by the conduct of another person unless the person's conduct prevents the parent with the obligation to support from fulfilling that duty. *Id.*

As respects the first, third and fourth elements of willfulness, Michael P. argues in his brief on appeal that, during the pertinent four month period, "Father P. and mother were married, he was not aware that he did not have legal custody of Robert N., and there were no court orders concerning an actual child support payment." Michael P.'s argument in this regard is without merit. It is well settled that the obligation to pay support is not dependent on an order to pay support. *See* Tenn. Code Ann. § 36-1-102(1)(H) ("Every parent who is eighteen (18) years of age or older is presumed to have knowledge a parent's legal obligation to support such parent's child…".); *In re Jacobe M.J.*, 434 S.W.3d 565, 572 (Tenn. Ct. App. 2013) ("A parent's obligation to support his or her child exists regardless of a court order requiring the parent to pay support.") (citing *In re Shandajha A. G.,* No. E2012-02579-COA-R3-PT, 2013 WL 3787594 (Tenn. Ct. App. July 17, 2013). When asked if he provided support, Michael P. responded, "No, sir, but I wasn't asked to." A parent's obligation to support his or her child is likewise not dependent on a request from the other parent.

As respects the second element, there is no evidence in the record that Michael P. had the ability to pay support during the four month period. In light of the absence of such proof, we cannot conclude, as a matter of law, that his failure to pay was willful. Accordingly, we reverse the holding that the evidence established that Michael P. willfully abandoned his child by failing to support Robert.

### b. Failure to Visit

The court also determined that Michael P. abandoned Robert by willfully failing to visit him; the court stated the following at the hearing:

> [W]ith respect to his visitation, it does sound like he saw the child a few times during the period August 2007 to December 2007. I believe that's a four month period when he was not incarcerated. But the Court finds that that was merely token visitation, and at the time it sounded like he was more interested in continuing his relationship with the mother of the child more than with the child itself, and that subsequently he was sentenced to a long period of time in prison and has had no meaningful contact with the child. So the Court believes that that ground is sustained.

6

Willfully failing to visit is defined as "the willful failure, for a period of four (4) consecutive months, to visit or engage in more than token visitation." Tenn. Code Ann. § 36-1-102(1)(E). Token visitation "means that the visitation, under the circumstances of the individual case, constitutes nothing more than perfunctory visitation or visitation of such an infrequent nature or of such short duration as to merely establish minimal or insubstantial contact with the child." Tenn. Code Ann. § 36-1-102(1)(C).

Michael P. testified that he was served with an order of protection[3] in July 2007 and that the order prohibited him from being near Mother and Robert. He also testified, however, that Mother occasionally brought Robert to visit him, and that the three of them would go out to eat despite the order. This testimony is evidence contrary to Michael P.'s contention that the order of protection deterred him from visiting Robert. Moreover, there is no testimony or other evidence that Michael P. sought visitation or relief from the order of protection.

As to Michael P.'s contention that his visitation with Robert was more than "token visitation," Michael P. testified that, during the four month period, he was separated from Mother and did not see Robert very often,[4] and that after the order of protection was dismissed,[5] he would accompany Mother to visit Robert at Grandmother's house. Grandmother testified that she recalled Michael P. visiting Robert on his first Christmas in 2006; that during the period from August to December 2007, Michael P. came by her

---

[3] The order is not in the record.

[4] Michael P. testified to the following:

> Q. And during that time of July of 2007 to December of 2007, did you make any attempts to see [Robert. N.]?
> A. Well, it was hard being that her daughter had signed the Order of Protection on my way out of prison.
> Q. Okay. Did you do anything to try to set that Order of Protection aside?
> A. I ended up having to get it dropped, and we had came to terms that I would pay and get it dropped. And after that I have seen my son a few times, and I even bought him presents for his first Christmas and his first birthday.
> Q. Okay. And that's - - when you saw him on his first Christmas was really the only time you ever saw him during that four or five month period. Is that correct?
> A. No, I seen him a lot.
> Q. How often did you see him?
> A. I've seen him - - well, let me rephrase that. I didn't see him a whole lot, just as much as I could being that me and his mom were married, but at the time we was kind of separated, and sometimes she would be there at the home babysitting, I guess, for [Grandmother], you know, babysitting our son, and I would see him then.

[5] Father testified that the court order was dismissed on "the very next court date." He did not state the date the order was dismissed.

7

house with Mother on one occasion and remained in the driveway; and that she had no knowledge regarding whether Mother ever took Robert to visit Michael P.

The testimony shows that Michael P. occasionally saw Robert; that he was not prevented by the order of protection from visiting Robert; that he did not make an effort to secure or enforce visitation; and that his visitation with Robert occurred when Michael P. was visiting with Mother. This testimony supports the trial court's finding that Michael P. visited Robert only when visiting Mother and that the visitation was "token visitation" within the meaning of Tennessee Code Annotated section 36-1-102(1)(c).

Accordingly, the court's determination that Michael P. willfully failed to visit Robert is supported by clear and convincing evidence.

## 2. Wanton Disregard

In the final order, the court held that Michael P. "engaged in a course of conduct which shows a wanton disregard for the welfare of the minor child, Robert…. [Michael P.], has a history of felony criminal charges in the State of Tennessee and has been incarcerated for a period exceeding ten (10) years." Pertinent to that determination, the court made the following statement at the hearing:

> [T]he ground for his termination that he's been incarcerated, or he's been sentenced to serve a term of incarceration that is ten years or more is well supported by the Exhibits and also the testimony of [Michael P.] himself….[W]ith respect to wanton disregard for the welfare of the child exhibited by [Michael P.], it is true I think from the proof I've heard, that [Michael P.]'s criminal activity occurred prior to the child's birth. But then there was the incident with the slamming of the cars, the incident that led to the Order of Protection, and then the incident that led him to be charged with aggravated assault. That at least occurred, I think, after the birth of the child. And, in fact, the child may very well have been in the car when he rammed it. That alone, I think, is sufficient to find by clear and convincing evidence that [Michael P.] has a wanton disregard for the welfare of the child.

Michael P. argues that the court erred in holding that there is clear and convincing evidence that he engaged in a course of conduct exhibiting a wanton disregard for Robert. Specifically, he contends that since Robert's birth, he has not engaged in any criminal conduct. For the reasons stated below, this contention, even if true, is not dispositive of the issue.

This court has held that repeated incarceration, criminal behavior, probation violations, substance abuse, and the failure to provide adequate supervision or support for

the child "can, alone or in combination, constitute conduct that exhibits a wanton disregard for the welfare of the child." *In re Audrey S.*, 182 S.W.3d at 868. The actions taken by the parent during the period of pregnancy may be considered in considering this ground of abandonment. *See In re F.N.M.*, No. M2015-00519-COA-R3-PT, 2016 WL 3126077, at *3 (Tenn. Ct. App. Apr. 11, 2016) ("[I]n the context of this ground for termination, 'our courts have extended the definition of 'child' to include the period of pregnancy.") (quoting *In re Anthony R.*, No. M2014-01753-COA-R3-PT, 2015 WL 3611244, at *3 (Tenn. Ct. App. June 9, 2015)). We have held that the conduct constituting a wanton disregard must have occurred when the parent had knowledge of the child. *In re F.N.M.*, 2016 WL 3126077, at *4 ("[T]he wanton disregard language of Tenn. Code Ann. § 36-1-102(1)(A)(iv) must be construed to *require that the father has knowledge of the child at the time his actions constituting wanton disregard are taken.*") (quoting *In re Anthony R.*, 2015 WL 3611244, at *3 (Tenn. Ct. App. June 9, 2015) (emphasis in original)).).

The evidence of wanton conduct consisted of Michael P.'s testimony[6] as well as certified copies of his criminal record.[7] The portion of the record pertinent to this issue

---

[6] Michael gave the following testimony relative to his behavior after learning of that Amanda was pregnant with Robert:

> Q. Okay. And when did you find out that she was pregnant with [Robert]?
> A. I found out that she was pregnant with [Robert] in April 2006.
> Q. Okay. So in April of 2006 you find out that she is pregnant with [Robert], and then in August of 2006 you go out and commit the offense for which you are now serving ten years. Correct?
> A. Yes.
> Q. Okay. So knowing that you have a child on the way, knowing that, you know, that that child is going to need a father at some point after birth, you go out and sell cocaine to someone else. Correct?
> A. Yes.
> Q. All right. You also, at some point in time after April of 2006 you committed assault and aggravated assault. Correct?
> A. That's the same incident that you're talking about.
> Q. Okay. And then in September of 2006 you resisted - - you picked up the charge of resisting arrest. Is that correct?
> A. Yes.
> Q. All right. And as a result of the new charge, you picked up a violation of probation or parole. Correct?
> A. Yes.
> Q. September 2007. Aggravated domestic assault. Do you remember that charge?
> A. Aggravated - - that's again the time that you're talking about ...
> Q. Okay.
> A. ... me and the car incident with Amanda.
> Q. All right. So you picked up that charge knowing that you were getting ready to have a - - and in fact, at that point in time, September 2007, Amanda – let's see, [Robert] had been born at that point in time. Correct?
> A. No.

9

shows that Michael P. learned of Mother's pregnancy in April 2006; that he was thereafter charged with a probation violation and otherwise engaged in criminal behavior, including aggravated domestic assault and resisting arrest; and that he was convicted of the offense for which he is currently incarcerated prior Robert's birth in December. This is clear and convincing evidence that Michael P. engaged in conduct that constituted wanton disregard for Robert's welfare within the meaning of Tennessee Code Annotated section 36-1-102(1)(A)(iv).

## B. Warren A.

Warren A.'s rights were terminated on the ground of abandonment by engaging in conduct prior to his incarceration indicating a wanton disregard for Cidney's welfare; in making the determination, the court stated:

> Respondent/Father, Warren A[ ], pursuant to Tennessee Code Annotated § 36-1-102(1)(A)(iv) has engaged in a course of conduct which shows a wanton disregard for the welfare of the minor child, [Cidney]. Respondent/Father, [Warren A.], has a history of felony criminal charges in the State of South Carolina and is currently serving a twenty-five (25) year sentence in South Carolina. Further, Father has had a vast series of discipline write-ups and discipline infractions during his incarceration.

---

Q. Okay.
A. Or what that - - excuse me, let me rephrase that. What day did you say?
Q. September 2007.
A. Yeah, [Robert] had been born in September 2007.
Q. And that's when you rammed her car with your car. Correct?
A. No. It was in 2006.
Q. Okay. So you picked up a different aggravated domestic assault then?
A. No. It was the same thing. The charge had - - I was charged in 2006, and basically the process of going through court probably ended in 2007.
Q. Okay.
A. . . . so it was just a paper trail.

[7] Exhibit 1 consisted of collective copies of certified records of Michael P.'s indictments and convictions in State and Federal Courts. On July 23, 1999, he pled guilty in Hamblen County Circuit Court to a Class B felony of possession of cocaine and a Class A misdemeanor of possession of marijuana, and was sentenced to the Tennessee Department of Corrections for three years and the Hamblen County jail for 11 months and 29 days, respectively. On July 2001 he pled guilty, again in Hamblen County Circuit Court, to three Class B felonies and a Class C felony for delivery of cocaine and was sentenced to the Department of Corrections for three years on each charge. On August 17, 2006, he was indicted in United States District Court for the Eastern District of Tennessee for possession with the intent to distribute crack cocaine; he subsequently pled guilty to the charge and was sentenced to 120 months. He testified that this was the sentence he was serving at the time of trial.

Warren A. argues that he has not engaged in any criminal conduct since before Cidney's birth and that his incarceration alone cannot constitute wanton disregard within the meaning of the statute. In addition, he contends that the court incorrectly considered Tennessee Code Annotated section 36-1-113(g)(6) in terminating his rights because it was not specifically pled in the Petition for Adoption. We address these contentions in order.

Warren A. testified that the criminal charges that resulted in his current incarceration occurred in 1997 and 1998—prior to meeting Cidney's mother; that he went to jail in 2002, which was two months after Cidney was born; and that he was not aware of Cidney's existence until she was five or six years old. As noted *supra*, in Section III. A.2, in order to sustain termination of parental rights on this ground, the parent alleged to have engaged in conduct evidencing wanton disregard for the welfare of the child must have had knowledge of the child at the time the conduct occurred. While Warren A.'s testimony at trial as well as the copies of his criminal convictions fully support a finding that he engaged in serious criminal behavior for many years prior to his incarceration, this conduct occurred prior to Cidney's birth. His uncontradicted testimony is that he did not learn of her existence until she was she was five or six years old.

In addition, the trial court relied on Warren A.'s disciplinary record in prison in sustaining this ground. Warren A. testified that, while incarcerated, he was charged with assault with intent to kill and possession of marijuana; that he took a rehab class stemming from his marijuana charge; and that he received several disciplinary actions for exhibitionism and lewd conduct. While the record shows that Warren A. has engaged in a series of acts that have resulted in disciplinary measures being taken against him while incarcerated, these acts do not come within the purview of Tennessee Code Annotated section 36-1-102(1)(A)(iv), which requires the conduct to have occurred prior to the parent's incarceration.

For these reasons, the evidence does not sustain the termination of Warren A.'s rights on the ground of abandonment by engaging in conduct evidencing wanton disregard for the welfare of Cidney. We reverse the termination of his rights on that ground.

With respect to Warren A.'s argument that Tennessee Code Annotated section 36-1-113(g)(6) was not specifically pled in the Petition for Adoption,[8] the allegations that are

---

[8] Tennessee Code Annotated section 36-1-113(g) reads in pertinent part:

> Initiation of termination of parental or guardianship rights may be based upon any of the grounds listed in this subsection (g). The following grounds are cumulative and non-exclusive, so that listing conditions, acts or omissions in one ground does not prevent them from coming within another ground:
> ***

specific to him are in paragraphs 12, 13, and 14; the paragraph pertinent to this issue is paragraph 14:

> 14.   Petitioner avers that Respondent/Father, [Warren A.], has engaged in a course of conduct which shows a wanton disregard for the welfare of the minor child, [Cidney], pursuant to Tennessee Code Annotated § 36-1-102(1)(A)(iv).   In support of this petition, Petitioner would show the Court that the Respondent/Father, [Warren A.], has a history of felony criminal charges in the State of South Carolina and is currently incarcerated in South Carolina on felony charges with a sentence end date of 2025.

At the conclusion of the hearing, the court stated the following:

> [A]lthough it's inartfully worded, I do think that [Grandmother's counsel] pled ten years incarceration in a manner that fairly gave [Warren A.] notice of what was being claimed as a ground for the petition.  And, of course, he does have a sentence that is more than ten years, and so that ground is sustained by clear and convincing evidence.

The importance of adequately pleading the grounds upon which termination of parental rights is sought has been addressed in several cases.  The touchstone of the requirement is that the parent be placed on notice of the ground in order to prepare a defense.  *See In re Landon*, No. M2011-00737-COA-R3-PT, 2012 WL 113659, at *4 (Tenn. Ct. App. Jan. 11, 2012) (reversing an order terminating parental rights because the petition did not allege the ground upon which the rights were terminated); *In re Anthony*, No. M2012-01412-COA-R3-PT, 2013 WL 500829 at *4, *7 (Tenn. Ct. App. Feb. 8, 2013) (holding that a court cannot terminate parental rights on a ground not alleged in the petition).  Upon our review of the record, we agree with the trial court that Warren A. was given adequate notice that his ten years of incarceration was being asserted as a ground for termination of his parental rights in accordance with section 36-1-113(g)(6). The record shows that he was provided with an adequate opportunity to present a defense to that ground if desired.

Prior to the introduction of proof, counsel for each party was given the opportunity to make an opening statement.  Counsel for Grandmother made the following comments

---

(6) The parent has been confined in a correctional or detention facility of any type, by order of the court as a result of a criminal act, under a sentence of ten (10) or more years, and the child is under eight (8) years of age at the time the sentence is entered by the court.

Tenn. Code Ann. § 36-1-113(g)(6).

regarding Michael P., which put counsel's subsequent comments regarding Warren A. into context:

> Michael P. is the biological and legal father of [Robert], . . . [Michael P. has been incarcerated due to Federal charges of possession with intent to distribute a cocaine base. He's been incarcerated since sometime in December of 2007. His sentence that he received was 120 months, or a ten year sentence.
> * * *
> Most importantly, Judge, we have alleged that he has shown a wanton disregard for the welfare of the child with regards to his criminal conduct. Further, that part of that is that he has been ordered to serve a sentence of ten years or more pursuant to § 36-1-113(g)(6). A parent who is ordered to serve a sentence of ten years or more as a result of criminal activity, it's a ground for the termination to occur. So we have alleged wanton disregard for that, and as a result we would ask that his parental rights be terminated.[9]

Counsel for Grandmother proceeded to discuss Warren A.:

> With regard to [Warren A] [he] is [Cidney's] biological and legal father. . . . [Warren A.] is presently, as previously stated, [Warren A.] is serving a sentence in the South Carolina State Prison facilities for several different criminal charges and convictions. He received in 2003, after the birth of the child, a twenty-five year - - total effective sentence of twenty-five years for charges and convictions consisting of voluntary manslaughter, murder, assault with intent to kill, various drug convictions, etcetera. All of those were run for a total effective sentence. All of those will run concurrently for a total effective sentence of twenty-five years, and he is just now a little bit into about twelve years or so, thirteen years or so, into that sentence. So basically the same allegations apply to [Warren A.] that applied to [Michael P.]. No child support during the time that he was out, and after the birth of the child, no contact or significant contact after the birth of the child and prior to his incarceration, and receiving a sentence of ten years or more as a result of criminal activity in the wanton disregard.

---

[9] The petition included the following paragraph relative to Michael P:

> 11. Petitioner avers that Respondent/Father, Michael [P.] has engaged in a course of conduct which shows a wanton disregard for the welfare of the minor child, [Robert], pursuant to Tennessee Code Annotated § 36-1-102(1)(A)(iv). In support of this petition, Petitioner would show the Court that the Respondent/Father, [Michael P.] felony criminal charges in the State of Tennessee and has been incarcerated for a period exceeding ten (10) years.

13

When asked for an opening statement, Warren A.'s counsel stated: "I would like to take [sic] my argument after he finishes his proof." Grandmother's counsel then proceeded to examine Warren A. regarding his history of criminal behavior and his then-current sentence, without objection. He testified that in December 2003, he pled guilty to and was convicted of a plethora of charges, including: two charges of voluntary manslaughter; two charges of assault and battery with intent to kill; armed robbery; obstruction of justice; two charges of possession of marijuana with intent to distribute; and discharging a firearm into a dwelling. He further testified that the sentences for the convictions were concurrent and resulted in a total sentence of twenty-five years in prison and release date in 2024.[10]

After the close of the proof, counsel gave closing statements. As part of his remarks, Grandmother's counsel stated:

> . . . Both of them are serving extensive criminal sentences. Both have received sentences of ten years or more. . . . [Warren A.] is serving a twenty-five year sentence for some very serious criminal charges outside of the State of, or inside the State of South Carolina. That in and of itself, pursuant to the grounds that I cited earlier, is grounds to terminate their parental rights.

When called upon to address the termination of Warren A.'s rights, his counsel argued:

> I do have a few arguments, Your Honor, in regards to grounds because I believe as a technicality would win. If you look at the petition, there's only three grounds alleged against my client. It's paragraph 12, 13, and 14. It's abandonment for failure to pay child support, abandonment for no visitation, and wanton disregard. At nowhere does the Petitioner allege the specific, I believe it's § 36-1-113(g)(6), the ten year - - having to be incarcerated for ten years is automatic grounds for termination. Unfortunately, the Court and the case law does not allow us to amend the pleadings to conform to the proof. He has to try his case based on those grounds alone. So take out the ten years. We can't even consider them because they're not in the petition in regard to my client.

We respectfully disagree with Warren A.'s argument that the trial court erred in considering Tennessee Code Annotated section 36-1-113(g)(6) as a ground for termination of Warren A.'s parental rights because the ground was not specifically pled.

---

[10]   Warren A. was participating in the hearing by telephone and his examination rambles at times, particularly the testimony stating the dates of the offenses and the dates of the convictions. His testimony in this regard, as well as the sentences imposed, is confirmed by the certified copies of the convictions introduced at the hearing.

14

While we do not discount the importance of proper pleading, at no time did Warren A.'s counsel object to the introduction of evidence relating to this ground, claim that the evidence is not within the scope of the pleadings, or assert that he was in any way prejudiced or that his defense was in any way compromised by lack of notice or opportunity to prepare. The record shows that, from at least the opening statement of Grandmother's counsel, Warren A. was put on notice that Grandmother was relying on the fact that he had been sentenced to prison for a term of more than ten years to terminate his rights, and that, rather than object to the consideration of the ground or request a continuance or other respite in the trial, his counsel chose to assert a "technicality" in order to "win." Counsel asserted no authority for the argument that "case law does not allow us to amend the pleadings to conform to the proof"; to the contrary, the law is clear that an issue can be tried by implied consent of the parties. *See In re Anthony R.*, No. M2012-01412-COA-R3-PT, 2013 WL 500829, at \*4 ("Even if a petition fails to identify the grounds for termination, it can be argued that the appropriate ground was tried by implied consent of the parties" (Citing *In re S.M.N.,* No. E2005-01974-COA-R3-PT, 2006 WL 1814852, at \*6 (Tenn. Ct. App. June 30, 2006)).

## C. Best Interest

Once a ground for termination has been proven by clear and convincing evidence, the court is then tasked with determining whether it is in the best interest of the child for the parent's rights to be terminated. *In re Valentine*, 79 S.W.3d at 546. Tennessee Code Annotated section 36-1-113(i) sets forth factors for courts to consider when determining the best interest of the child in termination cases.[11] The list of factors is not exhaustive,

---

[11] The factors at Tennessee Code Annotated section 36-1-113(i) are:

(1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;
(2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;
(3) Whether the parent or guardian has maintained regular visitation or other contact with the child;
(4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;
(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;
(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;
(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

and a court is not required to find that each factor exists before it holds that termination of parental rights is in the best interest of the child. *In re S. L. A.,* 223 S.W.3d 295, 301 (Tenn. Ct. App. 2006) (citing *Tenn. Dep't. of Children's Serv. v. T. S. W.,* No. M2001-01735-COA-R3-CV, 2002 WL 970434, at *3 (Tenn. Ct. App. May 10, 2002); *In re I. C. G.,* No. E2006-00746-COA-R3-PT, 2006 WL 3077510, at *4 (Tenn. Ct. App. Oct. 31, 2006)).

In the final order, the court made the following findings regarding the children's best interest:[12]

> 4. Termination of Respondents' parental rights to the minor children is in the best interest of the minor children. The following evidence supporting this finding cumulatively constitutes clear and convincing evidence of grounds and determination of the child's best interest:
>
> a. Respondent/Fathers, [Michael P. and Warren A.], did not make such an adjustment of circumstances or conditions to have a present, meaningful relationship between themselves and the minor children.
> b. Respondents/Fathers, [Michael P. and Warren A.], did not maintain regular visitation or contact with the children, did not provide support for the benefit of the children and has not maintained a meaningful relationship with the children since the children's birth.
> c. The Court further finds the termination of parental rights is in the children's best interests.
> d. The court finds that children have bonded with Petitioner; the Petitioner has served as the primary caregiver to the minor children the duration of the minor children's lives and the children are well adjusted and properly cared for.

Michael P. argues that the court erred in holding that termination of his parental rights was in the best interest of Robert. Warren A. does not contend that the court erred in holding that termination of his parental rights was in the best interest of Cidney; rather, he contends generally that the court erred in terminating his rights. In accordance with

---

> (8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or
> (9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

[12] Although not specifically designated in the order, we have determined that the findings relate to factors (1), (3), and (4). In the circumstances of this case, where both fathers have been incarcerated for most, if not all, of their child's life, the evidence pertinent to factors (3) and (4) is largely the same; consequently, we will discuss those factors together.

the instruction in *In Re Carrington H.*[13] that we review the trial court's findings as to each ground of termination as well as best interest irrespective of whether the issue is specifically raised on appeal, we will review the evidence pertinent to the holding that termination of Warren A.'s rights was in Cidney's best interest.

In our consideration of the best interest issue, we are mindful of the instruction in *White v. Moody*:

> [A]scertaining a child's best interests in a termination proceeding is a fact-intensive inquiry requiring the courts to weigh the evidence regarding the statutory factors, as well as any other relevant factors, to determine whether irrevocably severing the relationship between the parent and the child is in the child's best interests. The child's best interests must be viewed from the child's, rather than the parent's, perspective.

171 S.W.3d 187, 193-94 (Tenn. Ct. App. 2004) (internal citations and footnote omitted).

### 1. Michael P.

As respects factor (1), the trial court determined that Michael P.'s efforts were not of the nature and magnitude that would constitute an adjustment of circumstances within the meaning of the statute. Michael P. argues that "this Court should take into consideration [Michael P.'s] plans for the future, the familial relationships that will be severed as a result of this termination, and the conduct that [Grandmother] is engaging in by allowing [Mother] to be involved with the child" and that "he has not engaged in any criminal conduct since Robert's birth, he has completed parenting classes, and has a plan for the future upon his upcoming release." To support his contention, Michal P. cites his testimony that he has taken parenting classes while in prison and that he plans to secure work as a truck driver upon his release from prison. The evidence of self-improvement efforts that Michael P. has made in prison and of plans he has made for his life after release is not clear and convincing evidence that he has made such an adjustment of his life circumstance as to make it in Robert's best interest to be in his home. The efforts that Michael P. is making in prison, while commendable, are weighed against the best interest of Robert; the trial court determined, and we agree, that these efforts were not of the nature and magnitude that would constitute an adjustment of circumstances within the meaning of the statute.

With respect to factors (3) and (4) Michael P. testified that he made efforts to visit Robert prior to being incarcerated and has made efforts to communicate with him since. He testified that, prior to his incarceration in December of 2007, Mother brought Robert to visit with him a few times; that he went with Mother on occasion when she visited

---

[13] *In re Carrington H.*, 483 S.W.3d 507, 525-26 (Tenn. 2016), *cert. denied sub nom. Vanessa G. v. Tennessee Dep't of Children's Servs.*, 137 S. Ct. 44, 196 L. Ed. 2d 28 (2016).

Robert at Grandmother's home; and that he changed Robert's diaper "once or twice." He testified that, since he has been incarcerated, Mother has allowed him to speak on the phone with Robert, but that he has not spoken to Robert since 2012.[14] He also testified that he calls Robert "whenever he can" and has been prevented from speaking to him by Grandmother.[15]

---

[14] Michael P. testified:

> A. I've talked to [Robert N.] numerous times, but only through [Mother]
> Q. Okay.
> A. …since I've been here incarcerated. The last time I talked to [Robert], my parent - - my mom - - had took him a Game - - he wanted a Game Boy. It was Christmas and his birthday. I talked to him on his birthday. Probably 2012 was the last time I talked to my son.
> Q. Okay.
> A. I went and I talked to him through his mother. My mother had took a Game Boy Advanced over there, a new game that he had wanted, video game console, and that's the last time I spoke to him.

[15] Michael P. testified:

> Q. How often would you say that you called [Grandmother] to try and either talk to her or talk to your son?
> A. Oh, I call [Grandmother] whenever I can, you know. Sometimes she answers, sometimes she doesn't, you know. But she'll answer, and, you know, I ask about [Robert], and we'll talk, sit there and talk about [Robert]. And, you know, [Grandmother] is, don't get me wrong, [Grandmother] is extraordinary, you know. She's a extraordinary person 'cause I lived with [Grandmother] and, you know what I mean.
> Q. Right.
> A. I know her. But [Grandmother] basically, she wouldn't let me talk to [Robert] out of, you know what I mean, her own reasons, or whatever them being. But she have a thing as far as controlling the situation. You know what I mean? It's hard to actually tell her what, you know what I mean, there's only one person dictating one side, so it's hard to actually get your point across because it's either her way or no way, you know. And I…
> Q. Did you send…?
> A. … I've asked to speak numerous times with my son. She's always told me, as [Warren A.] had told you, she always told me that he wouldn't understand, you know. He's just a seven year old boy just trying to realize. And that's when I called when he was seven. You know what I mean?
> Q. Uh-huh (affirmative)
> A. Or when he's eight, you know what I mean, I called. He's just an eight year old boy. He wouldn't understand. Or even know he's just a nine year old boy, he wouldn't understand. You know what I mean?
> Q. And the same thing with regard to visits? Did you ask if she would ever bring him to you to visit?
> A. I've asked Amanda, and I've asked [Grandmother], you know. And unlike [Warren A.] I wasn't fortunate enough to even see my son since I've been here. I haven't seen my son since he was one years old.

Grandmother acknowledged that she has not permitted Michael P. to talk with Robert; when asked why she would not allow Robert to talk with his father, she responded:

> When you're a toddler, and you've got some stranger on the end of the line saying, "I'm your Daddy and I love you," you know, "Be a good boy," you know, and how do you explain to him where he is, why he's not there, why he's only on the phone, why he can't come. I mean, you don't, in my opinion, you don't do this to children, you know.

Viewing the record as a whole, we agree that Michael P. has not established a meaningful father-son relationship with Robert. The evidence is clear that, prior to his incarceration, Michael P. did not maintain regular visitation or contact with Robert, nor did he take measures to insure that he would have regular visitation or contact. Grandmother has not allowed him to speak with Robert since Michael P. has been incarcerated, due to her concern that such contact would not be good for the child. This court has previously held that "a meaningful relationship must be meaningful to both parties, especially where the child's interest is paramount." *In re M.H.*, No. M2005-00117-COA-R3-PT, 2005 WL 3273073, at *12 (Tenn. Ct. App. Dec. 2, 2005) (holding that "The father's rare and brief contacts with his son may have had some meaning to him, but from the point of view of a child so young, such tenuous contact is unlikely to carry very much meaning…There is simply no evidence that the child missed the calls from [Father] or had any significant connection to him."). The testimony cited *supra* section III.A.1.b relative to the finding that Michael P. willfully failed to visit Robert is equally applicable to factor (3) and, in turn, supports the holding that Michael P. has failed to establish a "meaningful relationship" with Robert, as contemplated by factor (4).

In addition to these specific factors, the court noted that Grandmother has been the primary caregiver for Robert and his siblings for their entire lives; that she has nurtured and provided for them and supported them financially; and has bonded with them. As to their well-being, Grandmother testified that the children are doing well in her home and that they are "Honor Roll" and "top student award students." The record clearly and convincingly supports the trial court's finding that Robert has bonded with Pamela N. and that he is being properly cared for.

Accordingly, the trial court's holding that termination of Michael P.'s parental rights is in the best interest of the children is clearly and convincingly supported by the record.

### 2. Warren A.

With respect to factor (1), the evidence as to whether Warren A. has made an adjustment of circumstances is that he has been in prison for the entirety of Cidney's life;

as noted earlier, he testified that he has been charged with assault with intent to kill and possession of marijuana, and has received several disciplinary write-ups and infractions for exhibitionism and lewd conduct while incarcerated. This is clear evidence that he has not made an adjustment of his circumstance since being incarcerated.

With respect to factors (3) and (4), the evidence of his relationship with Cidney consists of his testimony that, since discovering that she was his child, he occasionally spoke with her by telephone until Mother became incarcerated and that he called Grandmother regarding letters and pictures that he sent Cidney and was told that "she would give them to Cidney when she feels Cidney [is] ready to read the letters." When asked about restricting Warren A.'s contact with Cidney, Grandmother testified:

> Q. Did you actually tell [Warren A.] not to call your house anymore and ask to speak with Cidney?
> A. I don't remember exactly because I've had lots of calls from penitentiaries coming into my home as a result of [Mother's] connections with people. And I may have. I believe in giving fair notice to people that I felt like it was in Cidney's best interest not to be talking with him on the phone 'cause she was a little girl, and this is some pretty heavy duty stuff for little girls to have to figure out in their life, . . .
> Q. Okay.
> A. . . . how to deal with things like this. And I am protective of her, and I felt like it was in her best interest not to be communicating with [Warren A.].

This is not evidence of a meaningful relationship. To the contrary, the evidence shows that Warren A. was incarcerated two months after her birth, learned of her existence when she was five or six, and had not sustained contact from which to build a meaningful relationship since that time.

As with Robert, the finding that Cidney is doing well and is well cared for in Grandmother's care is supported by the evidence. The holding that termination of Warren A.'s parental rights was in the best interest of the child is supported by clear and convincing evidence.

## D. Other Issues

### 1. Effective Consent

Warren A. contends that Mother did not give effective consent to the Petition for Adoption, specifically, that because Mother never appeared before the court, "the court was not able to ensure that Mother knowingly provided consent to the adoption of her children." This contention is without merit.

20

Adoptions in Tennessee are governed by Chapter 1 of Title 36 of the Tennessee Code; proceedings to terminate parental rights in order to facilitate adoptions are governed by Tennessee Code Annotated section 36-1-113. Pertinent to this issue, sections 36-1-117(a)[16] and (f)[17], respectively, set forth the necessary parties to an adoption proceeding and the requirements for insuring that the child's natural parents, putative father, biological or legal relatives of the child, or custodian of the child are given notice of the proceeding.

Paragraph 16 of the Petition for Adoption states:

Co-Petitioner/Mother…joins this Petition for Adoption for the purpose of providing her consent to the adoption and for the purpose of terminating her rights to the minor children, [Robert, Cidney, and Jeremiah]. The Co-Petitioner understands that the minor children will be adopted by the maternal grandmother. . . [Pamela [N.], and the Co-Petitioner/Mother will have no legal rights to custody, control or visitation with the minor children in the future.

---

[16] Tennessee Code Annotated, section 36-1-117(a) states:

(a) Unless the legal parent or the guardian, or, as provided in subsections (b) and (c), the putative father of the child has surrendered parental or guardianship rights to the child, has executed a parental consent that has been confirmed by the court, has waived the person's rights pursuant to § 36-1-111(w) or (x), or unless the person's rights have been terminated by the order of a court of competent jurisdiction, the legal parents, guardian of the person of the child or of an adult, the biological mother, and the established father or putative father of the child must be made parties to the adoption proceeding or to a separate proceeding seeking the termination of those rights, and their rights to the child must be terminated by a court to authorize the court to order the adoption of the child or adult by other persons.

[17] Tennessee Code Annotated section 36-1-117(f) states:

(f) When the child is related to one (1) of the petitioners or is the stepchild of the petitioner, and the legal or biological parent or parents or guardian or guardians of the child signs the adoption petition as a co-petitioner for the specific purpose, as stated in the petition, of giving consent to the adoption, no further surrender, parental consent, or termination of parental rights shall be required as to that parent or guardian, as the act of joining in the adoption petition shall be deemed a complete surrender, notwithstanding subsection (g), and no further notice or service of process need be made to that person; provided, that where the stepparent of a stepchild seeks to adopt a stepchild, the co-signing of the petition by the child's parent who is the spouse of the petitioner shall not affect the existing parent/child legal relationship between that parent and the parent's child who is the subject of the adoption petition by the stepparent of the child.

Mother signed and executed a notarized acknowledgment showing her intent to have her parental rights terminated and waiving her right to notice for any additional proceedings.[18]  Thus, the trial court properly determined that Mother consented to the termination of her parental rights.  As set forth in Tennessee Code Annotated section 36-1-117(f), Mother's action in joining in the petition constituted her consent to the adoption and was deemed a complete surrender, with no further action required as to her.  Upon the record before us, Mother's consent to the adoption was effective and no notice or opportunity to be heard was required.

In the final order, the court confirmed Mother's consent in accordance with Tennessee Code Annotated section 36-1-117(g)(2).[19]  On remand the trial court should address the matters required by section 36-1-111(k) as part of the adoption proceeding.

### 2. Grandmother's Standing

Warren A. contends that Grandmother did not have standing to file the petition to terminate his rights; he argues that he did not receive notice of the proceeding by which Grandmother received custody of Cidney and, consequently, Grandmother's custody "was pursuant to an invalid Order."

Tennessee Code Annotated section 36-1-115(a) states that any person over the age of eighteen may file a petition for adoption; section (b) states that the petitioner "must have physical custody or must demonstrate to the court that they have the right to receive custody of the child sought to be adopted… ."  The record shows that Grandmother received custody of the children through orders of the Juvenile Court for Hamblen

---

[18]  The acknowledgement stated the following:

> I Amanda [N.], first being duly sworn, make oath that I have read the foregoing Petition for Adoption and that the facts set forth therein are true to the best of my knowledge, information and belief.  I further make oath that I intend for my parental rights to be terminated and by this document and hereby consent to the adoption of [R.N.; C.N.; and J.N.].  I waive any rights I have of notice to any other proceedings; including notice of the final hearing.

[19]  Tennessee Code Annotated section 36-1-117 states in pertinent part:

> It is specifically and expressly declared that the act of signing the adoption petition shall not terminate the parental rights of such parent until the court where the adoption petition is filed has entered an order confirming the parental consent and until the court shall have required such parent to answer, under oath, each of the questions required of parents pursuant to § 36-1-111(k), including the question regarding the contact veto required by § 36-1-111(k)(3).

County;[20] in addition, she testified that all three children have lived with her all their lives. Grandmother has had physical custody of the minor children, and accordingly, did have standing to file a petition to terminate Father A.'s parental rights.[21]

### 3. Unnamed Father

Warren A. also argues that the trial court erred in terminating the rights of the Unknown Father to J.N., contending that Grandmother failed to provide Unknown Father with sufficient notice of the termination proceedings. We have determined that Warren A. does not have standing to raise this issue.

The doctrine of standing is employed by courts to determine whether a particular litigant has a personal stake in the outcome of the controversy to warrant the exercise of the court's power on its behalf. *See American Civil Liberties Union of Tenn. v. Darnell*, 195 S.W.3d 612, 619 (Tenn. 2006) (citing *Mayhew v. Wilder,* 46 S.W.3d 760, 767 (Tenn. Ct. App. 2001); *Metro. Air Research Testing Auth., Inc. v. The Metro. Gov't of Nashville and Davidson Cty.,* 842 S.W.2d 611, 615 (Tenn. Ct. App. 1992). The doctrine, "grounded upon 'concern about the proper—and properly limited—role of the courts in a democratic society,'" precludes courts from adjudicating an action when a party's rights have not been invaded or infringed. *Darnell*, 195 S.W.3d at 619 (citing *Warth v. Seldin*, 422 U.S. 490, 498 (1975); Mayhew, 46 S.W.3d at 767). In order to establish standing, a plaintiff must show: (1) a distinct and palpable injury that is more than conjectural or hypothetical; (2) a causal connection between the claimed injury and the challenged

---

[20] A certified copy of the order granting Grandmother custody of Cidney and Robert was introduced as an exhibit at the hearing, and Grandmother testified that she was granted custody of Jeremiah. Warren A. did not object to the introduction of the order or raise any concern about the order. To the extent Warren A. questions Grandmother's custody of Cidney, there is nothing in the record to suggest that the order granting Grandmother custody is "invalid."

[21] Related to this argument, Warren A. also contends that Tennessee Code Annotated section 36-1-113 provides that "an individual filing a petition for termination of parental rights must have custody of the child." This is contrary to the wording of section 36-1-113, which states in pertinent part:

> The prospective adoptive parent or parents, including extended family members caring for a related child, any licensed child-placing agency having physical custody of the child, the child's guardian ad litem, or the department shall have standing to file a petition pursuant to this part or title 37 to terminate parental or guardianship rights of a person alleged to be a parent or guardian of the child. . .

Tenn. Code Ann. § 36-1-113(b)(1). Standing to file a petition to terminate parental rights only requires physical custody. *See In re Joseph F.*, 492 S.W.3d 690, 701 (Tenn. Ct. App. 2016), perm. app. denied May 10, 2016 (holding that because petitioners "had physical possession and therefore physical custody of the Children at the time of the petition's filing, they have standing to seek termination of Mother's parental rights pursuant to Tennessee Code Annotated § 36-1-115").

conduct; and (3) that the alleged injury is capable of redress by a favorable decision of a court. *Darnell*, 195 S.W.3d at 620. To have standing, a party must assert his or her own legal rights and not those of third parties. *Ross v. City of Gatlinburg, Tenn.*, 327 F. Supp.2d 834, 842, 2003 WL 23695323 (E.D. Tenn. 2003), aff'd, 113 Fed Appx. 113, 2004 WL 2413386 (6th Cir. 2004).

Warren A. is not the biological or legal father of Jeremiah and was not adversely affected or injured by any alleged lack of notice to Unknown Father of the proceedings or the termination of Unknown Father's parental rights. Accordingly, we decline to address this contention.

## IV. CONCLUSION

For the foregoing reasons, we reverse the judgment terminating Michael P.'s parental rights on the ground of abandonment by failure to support and the judgment terminating Warren A.'s rights on the ground of abandonment by engaging in conduct evidencing a wanton disregard for Cidney N.; in all other respects, the judgments terminating their parental rights, as well as the judgment terminating the parental rights of the unknown father are affirmed.

_____
RICHARD H. DINKINS, JUDGE